55 So.2d 898

**R. J. JONES & SONS v. MEYER et al.**

**SECURITY NAT. BANK. v. MEYER et al.**

No. 39794.

Dec. 10, 1951.

Harold W. Hill, Alexandria, for intervenor and appellant.

Gist, Thornton & Murchison, Alexandria, for appellees.

HAMITER, Justice.

The appeal in these consolidated cases presents a dispute between the Security National Bank and the partnership of R. J. Jones & Sons (referred to hereinafter as Bank and Partnership respectively) over a fund of $31,571.04 in the hands of the Sheriff of Rapides Parish, being proceeds of a sale under mortgage foreclosure of two parcels of land of four lots each, together with eight dwelling houses thereon, described as Lots 13, 14, 15 and 16 of Block 29 and Lots 1, 2, 3 and 4 of Block 28, in the Kent Addition to the City of Alexandria.

Recorded against the property, which at the time of the sale was owned by one Sylvin G. Meyer, were bona fide mortgages securing a total indebtedness due to the Bank in excess of the mentioned fund and also admittedly valid and binding material liens held by the Partnership in the aggregate amount of $16,319.67. Hence, for determination herein is the question of superiority of rank as between the mortgages of the Bank and the material liens of the Partnership.

The judgment of the district court gave preference to the Bank's mortgages. The Partnership appealed.

Respecting the priority of the lien or privilege of a furnisher of building materials, Louisiana Statutes Annotated—Revised Statutes of 1950, 9:4812, Section 12 of Act No. 298 of 1926, as amended by Act No. 323 of 1938, provides: "* * * The said privilege shall be superior to all other claims against the land and improvements except taxes, local assessments for public improvements, a bona fide mortgage, or a bona fide vendor's privilege, * * * if the vendor's privilege or mortgage exists and has been duly recorded before the work or labor is begun or any material is furnished. * * *"

The litigants concede, and the record discloses, that the Bank's mortgages were recorded July 29, 1948 on the four lots in Block 29 and October 11, 1948 on the four lots in Block 28; and that, as to both groups, the commencement of the furnishing of materials and of construction thereon occurred subsequent to the recordation of the respective mortgages. This being true, and in view of the above-quoted statutory provisions, it would seem that the mortgage claims should prevail.

But the Partnership, through its counsel, advances the theory that the buildings on the mentioned eight lots constituted an integral part of a large, continuous, housing development project of 22 houses started by the builder (Meyer) in the early part of

1948, and that its right to a superior lien or privilege relates back to the time of the commencement of construction under the entire project, a date prior to the recordation of the Bank's mortgages involved herein.

In considering this theory we find that in 1947 Meyer conceived the idea of constructing some 40 houses for the purpose of sale, and, with the hope of carrying it out, began negotiations with a Mrs. Mary Compton to acquire numerous lots of ground owned by her in the Kent Addition to the City of Alexandria. On February 3, 1948 a civil engineer, at Meyer's request, designated on a plat of part of that subdivision the lots on which Meyer then proposed to construct houses, they numbering 22 in all. About the same time Meyer applied to the Federal Housing Administration for commitments to underwrite mortgages securing loans on the 22 houses which he expected to obtain from T. J. Bettes Company of Alexandria. The commitments issued March 23, 1948.

Through an instrument signed March 9, 1948 by Mrs. Mary Compton, and accepted March 13, 1948 by Meyer, the negotiations respecting the acquiring of needed building lots were consummated. It recited that for the sum of $1800 cash Mrs. Compton had sold and transferred to Meyer Lots 1, 2, 3 and 4 of Block 42 of the Kent Addition. Further, according to the instrument, Meyer obligated himself to purchase, and Mrs. Compton promised to sell to him, nine other

tracts in the Kent Addition (numbered 1 to 9 inclusive), each consisting of four contiguous lots except tract No. 9 which was an irregularly shaped strip of land. As to these additional nine tracts Meyer was to purchase them according to the order of their listing, to acquire one tract every 80 days, and to pay for each the sum of $1800. Also contained in the written agreement were stipulations that in the event of default on the part of one party the other could elect either to enforce specific performance or to declare the contract null and void. Under the instrument, therefore, Meyer received title to four lots, and he obtained the right to purchase, at later specified dates and on his complying with certain conditions, 32 additional lots and an irregularly shaped tract (some of these were not shown on the engineer's plat, above mentioned).

Shortly after receiving title to the first group of four lots (1, 2, 3 and 4 in Block 42) Meyer began the construction of houses thereon, he patronizing for that purpose those furnishers of labor and materials (including the Partnership herein) that had quoted prices to him on a 22 house basis. During the course of this construction he found himself in need of funds and consulted the Bank herein. It agreed to and did provide for him interim financing, and to secure the payment thereof Meyer executed a mortgage, recorded April 14, 1948, on that first group. By July 15, 1948, the four houses in such group were com-

pleted, financed with FHA insured mortgages, and sold individually to third persons; and all previous indebtedness due thereon, including that to the Bank and to furnishers of labor and materials, was paid in full.

Meanwhile, Meyer received financial assistance from the Bank to construct a second group of four houses, for securing the payment of which his mortgage was recorded June 19, 1948. On the same date he placed of record a deed from Mrs. Compton to lots 13, 14, 15 and 16 of Block 42 (described as tract No. 1 in the contract of purchase). Immediately thereafter construction of the four houses of the second group began on such lots. These houses, just as those of the first group, were in due time completed, financed with FHA insured mortgages, cleared of all previous indebtedness, and sold.

Meyer employed the same procedure in commencing the construction of his third and fourth groups of four houses each, these being the two groups sold at Sheriff's sale and the proceeds of which form the basis of this litigation. Thus, as to each group, a deed for the necessary lots and a mortgage securing payment of the Bank's interim financing were first recorded; then followed the furnishing of the materials and the labor. But Meyer's operations with these two groups were never completed, apparently because of financial difficulties. And foreclosure of the Bank's mortgages resulted.

■■ Undoubtedly, Meyer, at the commencement of his construction program, intended the building of 22 houses (originally he had in mind 40). This is clearly indicated by the engineer's plat, by the FHA commitments, and by the quotations of prices on a 22 house basis obtained from the various furnishers of labor and materials. But we are unable to conclude that those houses were to be built as one continuous or a blanket development project, as suggested by the theory of the Partnership, whereby the superior lien rights of the furnishers of materials and labor would relate back to the time of the project's commencement. The evidence particularly relied on and emphasized by counsel for the Partnership does not sustain such a conclusion. Rather, it, as well as other evidence in the record, supports the view that all parties contemplated Meyer's constructing and financing of the houses in groups of four and that the furnishers of materials and labor were to be paid on the completion of either each house or each such group of houses.

The Partnership had no written contract obligating itself to furnish materials on the 22 houses. Neither did its manager testify that a binding oral agreement to that effect existed. He testified only that the Partnership had quoted to Meyer material prices per house for 22 houses. And to corroborate such testimony he produced a copy of a letter addressed to Meyer of date April 9, 1948, by which the quotations were given. Without reciting any quantities or naming any project or projects the letter merely listed items of materials and their respective prices.

True, a written contract was entered into by the Partnership and Meyer on April 13, 1948, respecting the plumbing in all of the houses. In the instrument, after describing the fixtures and installations necessary, the Partnership agreed: "We will do the above work for the sum of Six hundred Fifty-nine and 80/100 ($659.80) Dollars for each house, or a total of Fourteen Thousand, Five Hundred Fifteen and 60/100 ($14,515.60) Dollars for the 22 houses."

But the agreement further stated: "These houses are to be built in multiples of four (4), and payments shall be upon the completion of four (4) houses."

This plumbing contract was terminated by mutual consent on the completion of, as well as on the payment of all indebtedness affecting, the first two groups. And for obtaining plumbing in the remaining 14 houses Meyer contracted with the firm of Carr & Osborne, the written agreement between them stipulating that payment would be made on each house as accepted by the FHA.

Another written contract, relied on by counsel for the Partnership to sustain the theory of continuity of construction in a single development project, was entered into between Meyer and one E. T. Dunn

for the furnishing of all labor for the 22 houses. As did the plumbing agreement with Carr & Osborne, however, the instrument recited that payment was to be made on completion of each house and the FHA's acceptance of it.

From these contracts, and from the payments made thereunder on completion of the first two groups, it appears (as above pointed out) that although 22 houses were to be built Meyer's program was never considered by anyone as a single continuous transaction. Instead, it was viewed by all as a series of transactions, payment for the labor and materials to be made on completion and acceptance of each stipulated unit. And this seems to form the chief basis of distinction between the instant controversy and the two decisions relied upon by counsel for the Partnership, namely, Cox v. Rockhold, 14 La.App. 170, 128 So. 702, and Central Lumber Company v. Schroeder, 164 La. 759, 114 So. 644.

The material and labor claimant in the Cox case had agreed to provide the plumbing on 10 houses. The court found and held that his contract was not completed and exigible until all 10 houses had been plumbed in good and workmanlike manner and the plumbing, on final inspection and approval thereof, was functioning properly. Here the several agreements for the furnishing of labor and material were exigible as to each unit (a single house or a group of four houses) upon its completion and acceptance.

The situation in the Central Lumber Company case, unlike the one presently being considered, was that the interested parties themselves treated the four lots involved as a single piece of property and each structure placed thereon as an integral part of one improvement. Hence, the furnishing of material was viewed as one continuous transaction for the construction of a single improvement.

For the reasons assigned the judgment of the district court, insofar as it was appealed from, is affirmed.